William M. RENSCH, Plaintiff
and Appellee,

v.

RIDDLE'S DIAMONDS OF RAPID
CITY, INC., Defendant and
Appellant.

No. 15142.

Supreme Court of South Dakota.

Argued May 19, 1986.

Decided Sept. 3, 1986.

Rehearing Denied Oct. 8, 1986.

Robert F. LaFleur, LaFleur & LaFleur, Rapid City, for plaintiff and appellee.

Charles B. Kornmann, Richardson, Groseclose, Kornmann & Wyly, Aberdeen, for defendant and appellant.

SABERS, Justice.

Appeal from trial court's finding of conversion, award of damages and prejudgment interest. We affirm in part and reverse in part and remand.

Statement of Facts

On October 28, 1982, appellee William M. Rensch (Rensch), left two diamond rings to be cleaned with appellant Riddle's Keepsake Diamond Center (Riddle's) at the Rushmore Mall in Rapid City, South Dako-

ta. At that time, Riddle's was advertising free ring cleaning to the public. When Rensch returned later that same day to pick up his rings, he learned that Riddle's clerk had mistakenly given them to another customer. The rings were never recovered. In December of 1982, Rensch initiated an action for wrongful conversion against Riddle's.

On November 30, 1983, the trial court awarded Rensch a partial summary judgment on the issue of liability. A court trial on the issue of damages was held on September 24 through 26, 1984. The trial consisted of considerable testimony concerning the value of the two rings from expert witnesses on both sides. The trial court found that the entrustment of the rings by Rensch to Riddle's employee, which was based upon the invitation of "free ring cleaning," constituted a bailment, and that the misdelivery to the other customer constituted a conversion. The trial court further found that the measure of damages was the fair market value of Rensch's rings at the time and place of loss.

The two rings differed in size and value: the large ring was gold and was set with three diamonds, each approximately one carat in weight; the small ring was made of Black Hills gold and was set with a one-half carat weight diamond. Rensch purchased the large ring in 1976 for $2,495 from the catalog of S.A. Peck & Company (S.A. Peck) of Chicago, Illinois. The small ring was given to Rensch by a former spouse. No testimony was offered in regard to its original purchase price.

Although Rensch purchased the large ring from S.A. Peck who does a mail order business in Rapid City, the trial court rejected opinion evidence of the amount for which the ring could have been purchased from S.A. Peck in 1982 and refused to consider catalog prices in determining their fair market value. The basis of the court's decision was that the local price of diamonds in Rapid City was higher than the prices for which diamonds could be purchased from catalog stores such as S.A. Peck, J.C. Penney, and LaBelle's.

The trial court determined that as of October 28, 1982, the market value of the large ring was $15,000, and the market value of the small ring was $2,500. Therefore, the trial court found Riddle's liable to Rensch in the amount of $17,500 for the conversion of his rings, and awarded prejudgment interest at the rate of 18% from October 28, 1982, to the time of entry of judgment plus costs. Riddle's appeals.

**Were Issues Preserved for Appeal?**

A major thrust of Rensch's brief and argument is that Riddle's failed to preserve the issues for appellate review. We have considered his contentions in light of the settled record and trial transcripts, and conclude that Riddle's sufficiently preserved the issues for review.

1. DID THE TRIAL COURT ERR IN FAILING TO ADOPT THE RESTATEMENT (SECOND) OF TORTS § 222A?, AND, SHOULD RIDDLE'S HAVE BEEN LIABLE ONLY FOR BREACH OF IMPLIED CONTRACT OR LOSING RENSCH'S PROPERTY INSTEAD OF WRONGFUL CONVERSION?

These issues will be considered together. SDCL 21-3-3 provides in full:

The detriment caused by the wrongful conversion of personal property is presumed to be:

(1) The value of the property at the time of the conversion, with the interest from that time;

(2) Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party;

(3) A fair compensation for the time and money properly expended in pursuit of the property.

Such presumptions cannot be repelled in favor of one whose possession was wrongful from the beginning by his subsequent application of the property to the

benefit of the owner, without his consent.

It is obvious that our statute does more to specify damages than it does to define conversion. Under the Restatement (Second) of Torts § 222A, conversion is an intentional exercise of dominion or control over a chattel, which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. Similarly, in *Scherf v. Myers*, 258 N.W.2d 831 (S.D.1977), we wrote: "Conversion is the act of exercising control or dominion over personal property in a manner that repudiates the owner's right in the property or in a manner that is inconsistent with such right." *Id.* at 834.

Riddle's emphasizes the fact that they inadvertently misdelivered the rings, that there was no intention to deprive Rensch of his property, and that the error was made in good faith. However, the weight of authorities provide that these factors are of little consequence in relation to liability for conversion.

In *Poggi v. Scott*, 167 Cal. 372, 139 P. 815 (1914), plaintiff sought to recover the sum of $2,000 in damages for defendant's unlawful conversion of some 200 barrels of plaintiff's wine. *Id.* 167 Cal. at 372, 139 P. at 815. In finding for the plaintiff, the court stated:

> The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.

*Id.* 167 Cal. at 375, 139 P. at 816. Similarly, in *Newhart v. Pierce*, 254 Cal.App.2d 783, 793, 62 Cal.Rptr. 553, 561 (1967), the court stated, "A taking clouded by mistake is no less a wrongful taking. The wrongful exercise of dominion over another's personal property is the gist of the action."

In *Bader v. Cerri*, 96 Nev. 352, 609 P.2d 314 (1980), the court affirmed an award of $18,270 for the conversion of cattle and stated:

> A conversion occurs whenever there is a serious interference to a party's rights in his property. The act constituting 'conversion' must be an intentional act, but it does not require wrongful intent and is not excused by care, good faith, or lack of knowledge.

*Id.* at 317, n. 1.

■ Therefore, the motive which prompted Riddle's to dispose of Rensch's property is immaterial, *Mapledge Corporation v. Coker*, 167 Neb. 420, 93 N.W.2d 369, 373 (1959), and provides no defense, *Fulks v. Fulks*, 95 Ohio App. 515, 121 N.E.2d 180, 182 (1953). Intent or purpose to do a wrong is not a necessary element of proof to establish conversion. *Id.* "The intention required is simply an intent to use or dispose of the goods, and the knowledge or ignorance of the actor as to their ownership has no influence in deciding the question of conversion." *Watkins v. Layton*, 182 Kan. 702, 324 P.2d 130, 134 (1958). *See also: Allred v. Hinkley*, 8 Utah 2d 73, 328 P.2d 726, 728 (1958); 18 Am.Jur.2d *Conversion* § 3 (1985).

Although Riddle's good faith, motivation, or inadvertence in misdelivering the rings to another customer does not affect their liability for conversion, these factors may have some effect on the assessment of damages under the Restatement (Second) of Torts § 222A. Riddle's advances the following factors to avoid paying full value for the rings:

(1) the extent and duration of Riddle's exercise of dominion or control;

(2) Riddle's intent to assert a right in fact inconsistent with Rensch's right of control;

(3) Riddle's good faith;

(4) the extent and duration of the resulting interference with Rensch's right of control;

(5) the harm done to the rings; and

(6) the inconvenience and expense caused to Rensch;

*Id.* at § 222A(2); 18 Am.Jur.2d § 113, and urges this court to consider the following mitigating facts:

—The rings were mistakenly given to another patron who absconded with them;

—Riddle's clerk had no intention to deprive Rensch of his property;

—The clerk did not act out of malice or ill will;

—The inconvenience and expense caused to Rensch has been exaggerated in light of the fact that Riddle's immediately offered to replace the two rings with merchandise of equal or better value;

—Rensch has refused to consider offers of replacement.

Based on the foregoing, Riddle's contends that it would be unjust for them to be required to pay the full, fair market value of the rings under § 222A. We are not persuaded by this argument.

■ A bailment is generally defined as "the delivery of a thing to another for a special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men." *Windeler v. Scheers Jewelers*, 8 Cal.App.3d 844, 88 Cal.Rptr. 39, 43 (1970) (citations omitted). A "bailment" imports that the delivery of personal property in trust to another shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it. *Johnson v. Hanna*, 78 S.D. 324, 332–333, 101 N.W.2d 830, 835 (1960).

In discussing the bailment contract, 8 Am.Jur.2d *Bailments* § 54 (1980) provides:

A bailment relation is a contractual arrangement, and may result either from an express contract or from a contract implied in fact or in law. The bailment contract is governed by the same rule of law that govern other contracts. There must be a delivery ... A further essential is the agreement to return the subject matter of the bailment, either on demand or at the stipulated time ... In short, no particular ceremony or actual meeting of the minds is necessary; the element of lawful possession, however created, coupled with a duty to account for the thing as the property of another is sufficient to constitute a bailment, regardless of whether or not such possession is based on contract in the ordinary sense.

Riddle's further argues that their liability for failure to return the rings should be predicated on breach of the implied bailment contract or negligence. If Riddle's is correct, the measure of damages for the loss of Rensch's property may be governed by general principles.

In *Allen v. Line*, 72 S.D. 392, 34 N.W.2d 835 (1948), we stated:

Conversion of property by a bailee may be committed in two ways: (1) By acts in derogation of bailor's title; and (2) by acts in derogation of bailor's possessory rights. (citation omitted).

*Id.* 72 S.D. at 395, 34 N.W.2d at 837. Here, the evidence shows that Riddle's deprived Rensch of his possessory rights in the rings when Riddle's mistakenly delivered them, without authority to do so, to a third party who kept them.[1]

Similarly, in *Baer v. Slater*, 261 Mass. 153, 158 N.E. 328 (1927), plaintiffs' merchandise, which was consigned to defendant for sale, was ordered by plaintiffs to be returned to them. Plaintiffs directed defendant to reship the merchandise by "ex-

---

1. 8 Am.Jur.2d § 181 provides in part:

It is uniformly held that a delivery of bailed property by the bailee to one not the true owner and not authorized by the bailor to receive it is, of itself, a conversion and a breach of the contract of bailment for which the law imposes absolute liability on the bailee for loss or damage occasioned thereby, irrespective of the fact that he may have acted in good faith and without negligence, and though the misdelivery may have been the result of innocent mistake, or have been induced by fraud or trick[.]

press." Thereafter, the defendant delivered the property to an imposter who was disguised as a railway employee, instead of to an authorized agent of the express company. The imposter absconded with the merchandise. In holding defendant liable for conversion, the court stated:

> [T]he defendant, while intending to make, and believing that he had made delivery to the express company, in fact gave possession of the merchandise to a stranger. 'A delivery to an unauthorized person is as much a conversion as would be a sale of the property, or an appropriation of it to the bailee's own use. In such cases neither a sincere and apparently well founded belief that the tortious act was right, nor the exercise of any degree of care, constitutes a defense even to a gratuitous bailee.' (citations omitted).

*Id.*

Under the *Baer* rationale, Riddle's "innocent misdelivery" of the bailed rings to the wrong person, which property was never recovered, does not mitigate Riddle's liability for conversion.[2]

■ Based upon the facts and circumstances and the foregoing authorities, we find that the trial court's conclusions were not clearly erroneous and that it was not error to reject Restatement (Second) of Torts § 222A(2), nor liability based on breach of the implied bailment contract. Accordingly, we affirm the trial court's conclusion that a wrongful conversion, under SDCL 21-3-3, did, in fact, occur.

## 2. DID THE TRIAL COURT ERR IN REFUSING TO CONSIDER CATALOG PRICES IN DETERMINING THE FAIR MARKET VALUE OF THE CONVERTED RINGS?

■ The measure of damages for conversion is the value of the property at the time and place of conversion, with interest from the date of conversion. SDCL 21-3-

3; *Mapledge*, 93 N.W.2d at 373; *Richtmyer v. Mutual Live Stock Commission Co.*, 122 Neb. 317, 240 N.W. 315, 316 (1932). Generally, in a bailment action followed by a conversion, the bailee's liability in damages is the value, or the reasonable value of the property at the time of the conversion plus interest. 8 Am.Jur.2d § 348.

The trial court set forth the correct measure of damages as follows:

> The measure of damages is the fair market value of the rings in question at the time and place of the loss. Fair market value is ascertained by determining what a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, would arrive at as the purchase price of the rings.

Riddle's urged the trial court to consider the prices of catalog companies such as LaBelle's, J.C. Penney, and S.A. Peck for rings similar to Rensch's, in determining the fair market value on October 28, 1982. The trial court disallowed this evidence because "the local price of diamonds in Rapid City was higher than the prices which diamonds could be purchased for from catalog stores." Riddle's further contended that catalog companies doing business in Rapid City are as much a part of the "retail market" as jewelry stores actually located there.

The trial court concluded:

> So called "wholesale" jewelry merchants who sell their products through catalogs, such as S.A. Peck and Co., make their products available to their catalog customers at prices that are lower than can be obtained at local jewelry stores in Rapid City, South Dakota.

> The market value of the large ring cannot be determined by ascertaining what the ring could have been purchased for from S.A. Peck and Co. in 1982 since the local price of diamonds in Rapid City is

2. *See also: Rubin v. Huhn,* 229 Mass. 126, 118 N.E. 290, 291 (1918) (Gratuitous bailee's conduct in misdelivering a diamond earring to one unauthorized to receive it and without the bailor's permission, *held* a conversion. Bailee held liable for the value of the earring at the time it was converted).

higher than the prices which diamonds may be purchased for from catalog stores such as S.A. Peck and Co.

■ The problem with the trial court's conclusion is that the local price is the retail price, and the retail price [3] includes catalog prices. Indeed, Rensch purchased the large ring from the S.A. Peck catalog in Rapid City. It follows that S.A. Peck does business in Rapid City and is part of the retail market. Therefore, it was error to exclude prices from catalog companies such as LaBelle's, J.C. Penney, and S.A. Peck.

As indicated above, the trial court heard considerable expert testimony concerning the value of the rings, especially the larger ring. The trial court expressed the opinion that it was very impressed with the expert testimony offered by Riddle's, especially that of Mr. Jess Riddle. The large ring was assessed by all of Riddle's expert witnesses and the mid-point of their price ranges were as follows:

| | | |
|---|---|---|
| Mr. Jess Riddle | — | $ 6,875.00 |
| Mr. Richard Baumann | — | 9,637.50 |
| Mr. Frederick Goynshor | — | 11,000.00 |
| Average Mid-Point | | $ 9,170.83 |

The trial court expressly acknowledged the expertise of Riddle's experts, but chose to reject their evaluations because they were based in part on catalog prices. As indicated above, the trial court valued the large ring at $15,000. However, the basis for this determination was erroneous be-cause the court improperly excluded cata-log prices.

Accordingly, we hold that the trial court abused its discretion in denying admission of the catalog evidence. The fact that cata-log prices are indeed lower than other es-tablishments in Rapid City is exactly the point, given that catalog companies reflect a part of the retail market, and thus, should have been included to measure the fair market value. Therefore, the determi-nation of damages is reversed, and this case remanded to the trial court to consider catalog prices in arriving at the fair market value of the rings.[4]

### 3. WAS PREJUDGMENT INTEREST MANDATORY?

■ In actions for conversion, it is gen-erally recognized that interest on the value of the property converted may be recov-ered from the date of conversion to the date of trial. The purpose of the award is to compensate the plaintiff for the loss sustained because of the taking of the property. Interest on the amount recov-ered may be allowed as a matter of right or by virtue of statutory provision. 18 Am. Jur.2d § 121.

■ Under SDCL 21–3–3, *supra,* Rensch had the option of having his damages mea-sured either by the market value of the converted rings with interest, or by the highest value of the rings without interest. *Kennel v. Atlas Elevator Co.,* 34 S.D. 101, 103, 147 N.W. 272 (1914). Based upon

---

**3.** SDCL 10–45–1(5) defines "retail sale" or "sale at retail" as the sale of either tangible personal property or services, or both, to the consumer or user thereof, or to any person for any pur-pose other than for resale ... SDCL 10–45–1(6) defines "retailer" as every person engaged in the business of selling tangible goods, wares, or merchandise at retail ... By contrast, "whole-sale" is generally defined as the sale in large quantity to one who intends to resell. *See:* SDCL 35–1–1(13); *Guess v. Montague,* 51 F.Supp. 61, 65 (D.C.S.C.1942) ("The word retail 'means a sale in small quantity or direct to the consumer, as distinguished from the word wholesale, meaning a sale in large quantity to one who intends to resell.' "). Catalog compa-nies sell at retail direct to the consumer. Whether or not they have a place of business in the state does not defeat the fact that catalog companies are engaged in the business of selling merchandise direct to the consumer, and not for resale. Therefore, they are "retail", not "wholesale".

**4.** As noted above, Rensch purchased the large ring from S.A. Peck in 1976, for $2,495. The trial court mentioned that it was significant that most of the experts in this case agreed that the value of diamonds had increased two and a half to three times from 1976 until October of 1982. In determining the fair market value on re-mand, the trial court may, along with all the other evidence, consider the original purchase price of the large ring plus the increase in the value of diamonds over that period of time.

Rensch's election under section (1) of the statute, the trial court awarded him pre-judgment interest at the rate of 18% from the time of the conversion, i.e., October 28, 1982, until the time of entry of judgment. In light of the guidelines set forth in SDCL 21–3–3(1), we find no abuse of discretion.

FOSHEIM, C.J., and MORGAN and HENDERSON, JJ., concur.

WUEST, J., concurs specially.

WUEST, Justice (concurring specially).

I concur in the majority opinion except as to footnote 4. Cost of an article may or may not be at the fair market value. The fact that Rensch paid $2,495 for the large ring does not prove its fair market value at the time he purchased it, nor does it establish the fair market value now.